Sema *v.* Pettinger and Pettinger.

324

Argued October 13, 1933.

Before Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*T. Henry Walnut,* for appellants.

*Albert H. Wernick,* for appellee.

Opinion by Cunningham, J., March 3, 1934:

Between five and six o'clock on the evening of October 3, 1931, plaintiff was driving a Chevrolet truck north on Ninth Street, in the City of Philadelphia; as he approached its intersection with Callowhill Street, Caroline Pettinger, one of the defendants, was driving the Buick sedan of her father-in-law, John Pettinger, the other defendant, eastwardly on Callowhill. The vehicles collided in the intersection; the truck upset about fifteen feet north of the northeast corner of the streets. Traffic flows only one way on each street; Ninth Street is twenty-six feet in width

from curb to curb and Callowhill twenty-eight; high buildings are erected upon all the corners and a single trolley track is laid on each street.

Plaintiff's action for personal injuries resulted in a verdict in his favor in the sum of $3,500 (reduced by remittitur to $2,500); defendants' motions for judgment n. o. v. and for a new trial were overruled and they have appealed from the judgment entered upon the verdict.

We think the case was necessarily for the jury; defendants' motion for judgment upon the whole record was, therefore, properly denied.

The motion for a new trial was based chiefly upon alleged errors in the charge. Defendants' specific complaint, as detailed in their 2d, 3d, 4th, 5th, and 6th assignments, is that the learned trial judge instructed the jury: (a) "If [the accident] occurred in the manner the plaintiff contends, [the] verdict [should] be in favor of the plaintiff, because then there was no contributory negligence;" and (b) "Of course, under the law, the defendants were guilty of negligence on their own version of the accident. ...... If it occurred as the defendants contend, your verdict should be in favor of the plaintiff, unless you conclude from the evidence that he was guilty of contributory negligence."

The consideration and disposition of these assignments necessitates a review of the conflicting testimony with which the court was dealing.

Plaintiff's version of the accident reads: "Q. Tell us what you did when you reached the intersection of 9th and Callowhill Streets? A. When I got to the corner of 9th and Callowhill, there was people crossing the street, so I stopped, and I waited until they crossed the street. So then I looked to my left and I seen a car coming about 150 feet away; so I started;

I put it in first gear and started to go. Then I looked to my left again, and I saw in the center of the street —I seen this car 75 feet away. I kept on going, and then I heard a crash in the back of me, and that is all I remember until I woke up in the hospital later. Q. In which direction were these people walking before you reached the intersection? A. There was some people crossing the street, going east, and other people, some going southwest.'' The point at which plaintiff claimed he stopped his truck was thus described in his cross-examination: ''A. Well, I stopped right near the car tracks, before you get to the car tracks. Q. You were in the car tracks going north on 9th Street? A. One wheel was in the car track, and the other was on the right-hand side. Q. Then you came to the intersection of Callowhill Street? A. Yes. Q. And stopped your car on 9th Street? A. Stopped the car on 9th Street. Q. Can you tell us where that was in reference to the intersection of Callowhill Street? A. Just before you come to the tracks. ..... Q. Which side of Callowhill were the people crossing, north or south side? A. On the south side. ....... Q. So you were right in Callowhill Street before you started your truck? A. I waited to let those people cross over. Q. Could you look all the way west of Callowhill Street? A. Yes. Q. You saw a truck [car] 150 feet away? A. Yes, sir. Q. Then you threw your car [truck] into first gear and started across Callowhill Street? A. Yes, I started to go. ...... Q. Did you keep your eye on the car coming east? A. When I seen the car 150 feet away I started to go. Then I looked again and I saw it about 75 feet away from me. Then I kept going, and I heard a crash in back of me.''

Plaintiff testified he did not know how fast the automobile was coming. Two witnesses called by him stated they were riding in a Whippet sedan behind

plaintiff on Ninth Street, but more to the left, and when within about fifty feet of Callowhill Street saw defendants approaching from the west and saw the collision. Their testimony substantially corroborated that of plaintiff. One of them said the sedan struck the truck on the left and rear between the fender and the running board; he fixed the speed of the sedan at thirty-five or forty miles per hour.

Under this testimony, we are not prepared to say the trial judge erred in instructing the jury that if the accident "occurred in the manner the plaintiff contends, your verdict would be in favor of the plaintiff, because then there was no contributory negligence."

The second branch of defendants' complaint against the charge raises a more serious question. We think their criticism of the instruction above quoted in subparagraph (b) is justifiable.

The first part was a positive declaration that if the jury believed Mrs. Pettinger and the witnesses called in her behalf, she had been guilty of negligence, as a matter of law, and the verdict should therefore be in favor of the plaintiff. We shall consider the qualification (submitting the question of plaintiff's contributory negligence to the jury) later.

When we turn to the testimony of Mrs. Pettinger and her witnesses we find a different version of the occurrence. Her father-in-law was sitting beside her in the front seat of the sedan, her mother-in-law, one of her children, and a man by the name of Cooper were in the rear seat. They lived in Asbury Park, N. J., and were endeavoring to find their way to the Delaware River Bridge. Mrs. Pettinger testified she was driving and watching the traffic and her father-in-law was watching for street signs. In response to the question, "Tell us what happened?" she said: "A. I was going east on Callowhill Street, and as I approached the intersecton of 9th and Callowhill Streets,

there was this truck approaching; and as I saw that, I turned and stopped, going the same way he did so as to avoid my hitting him broadsided. He went right on, and the front of his fender—the cab or body where it protruded from the driver's cab caught us— caught our right fender and lamp, and he went about 25 feet and swerved about a couple of times, which upset him.''

The trial judge, feeling this answer was not sufficiently clear, interrogated her at length; and from her replies to him and to the respective counsel these additional details appear. As she approached the intersection she slowed down to ''between 12 and 15 miles an hour'' and was looking to the right; when she had gotten ''just past the crossing'' for pedestrians on the west side of Callowhill she saw plaintiff's truck ''between 20 and 30 feet'' to her right and ''coming very fast ......, between 30 and 35 miles an hour'' and in the ''center of 9th Street.''

A portion of her examination by the trial judge reads: ''Were you in the center, or the north or south side of Callowhill Street? A. I was on the right-hand side of Callowhill. Q. As your automobile came up to that crossing, just before you went into the crossing, before any of your car got into the intersection, the area that comprises the intersection, did you look? A. Yes. Q. Did you see the truck, then? A. It was just about the width of the road. How many feet? That would be, I suppose, about 20 feet. Q. About 30 feet away? A. I should not want to say how many feet. Q. You said before it was about 30 feet away. A. Well, between 20 and 30. Q. And, it was coming at a good speed? A. Yes. Q. That was just before you went into the crossing to go across, as you came up to it? A. Yes. Q. Why didn't you stop there? You were not in his path then? A. Well, I did stop. Q. You did not. You said you swerved to the left.

Was it because you did not see him, or because you were not able to stop in time? A. No; I was able to stop. Q. To avoid having to swing to the left? A. He seemed to be there so quick, I turned to the left." In reply to a question from her counsel as to whether the truck changed its course, she said: "A. No, until after it hit our lamp; then he swerved to the right, then to the left."

J. W. Pettinger testified he was sitting on the front seat and looking for signs indicating the road to the bridge. He gave this account of the accident: "A. The first thing I saw was this car, this truck coming down the street, at about 40 miles an hour. I says, 'Look out.' Just as soon as I said that, she put her foot on the brake and pulled on the side, and this car came so quick it hit her from the side, hit the hub cap and rolled the mud-guard under from the side, and pushed the lamp over against the mud-guard." When asked what happened to the truck, he replied: "A. He pulled hard to his right, and then he was going to the sidewalk, and then he pulled to his left, and that threw him on the sidewalk. ...... If he had laid over one foot he would have cleared us, and why didn't he do it? Q. If you had stopped within one foot, he would have cleared you? A. Yes, but we couldn't do it. He was on us as though he dropped out of the sky."

Sidney H. Cooper, another occupant of the car, said: "As she put the brakes on suddenly, she pulled slightly to the left, and he comes right into the car with a body projecting about two feet over the rear wheels, and that body hit the light and mud-guard—I judge from the feel of it that the left hind hub struck the front hub on our car. Q. Did the truck slow up? A. He made an 'S' swing first to the right, and the other to the left, and from that it flopped over. ......
When I saw the truck coming, the driver of the truck

was looking in the opposite direction. He was not looking this way. I never saw him turn his face this way at all.''

The conclusion of the trial judge upon the question of Mrs. Pettinger's negligence, assuming the jury accepted her testimony and that of her witnesses, was thus expressed in the portion of the charge covered by the fourth assignment: ''This lady came up to this intersection at least in such a manner that when she saw within 30 feet of her on her right this car, it was her duty to stop; and if she was going at such a speed that she could not stop, she was negligent, because the drivers of all vehicles must approach an intersection in such a manner, and with their cars in such control, that if somebody else is there who has the right-of-way, they can stop and give it to him. Failure to do that is negligence. Of course, under the law, the defendants were guilty of negligence on their own version of the accident.''

This was followed by a correct description of the mutual rights and duties of drivers approaching an intersection in the course of which it was said: ''The duty was upon both of those vehicles, as they came up to the intersection—that is, upon the operators of them—to keep their cars under such control that each one could do his or her duty with respect to others and take reasonable care to look out for themselves.''

The instruction which we deem erroneous was given in the concluding portion of the charge and reads: ''If [the accident] occurred as the defendants contend, your verdict should be in favor of the plaintiff, unless you conclude from the evidence that he was guilty of contributory negligence. Which way did it happen? That is for you to say.''

The difficulty is this. The language quoted referred only to the testimony of Mrs. Pettinger and the witnesses called by her. Granting that this testimony

may have warranted the trial judge in declaring that it convicted her of negligence, it is perfectly clear that it also convicted the plaintiff of contributory negligence in driving up Ninth Street and dashing into the intersection at a rate of thirty-five or forty miles per hour. If both were guilty of negligence the defendants were entitled to a verdict in their favor and the jury should have been so instructed.

In our opinion, the erroneous and prejudicial effect of the instruction to return a verdict for the plaintiff even if the jury believed the accident occurred "as the defendants contend" was not lessened by the addition of the qualification "unless you conclude from the evidence that he was guilty of contributory negligence." Apart from the defendants' evidence—which the court said required a verdict for the *plaintiff*— there was no evidence in the case from which the jury could find plaintiff guilty of contributory negligence. As we read the charge, it practically amounted to binding instructions for the plaintiff. The jury was told that under the plaintiff's version of the facts he was entitled to a verdict and under the defendants' version of the facts plaintiff was also entitled to a verdict. This was incorrect. While under plaintiff's story he was entitled to a verdict, under defendants' version they were entitled to a verdict—not because they had cleared themselves of negligence, but because by their evidence and that of their witness they had fastened contributory negligence upon the plaintiff.

We think the jury should have been instructed upon this branch of the case that the single issue was whether they believed plaintiff and his witnesses or defendants and their witness; if the former, to return a verdict for him, but if the latter, to find in their favor. The sixth assignment is sustained and a new trial directed.

Judgment reversed with a venire.